UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAMMY MACDONALD, and <br> JEFFREY MACDONALD, <br><br> Plaintiffs, <br><br> v. <br><br> SERVIS ONE, INC., d.b.a. BSI <br> FINANCIAL SERVICES, <br><br> Defendant. | No. 21-cv-6070 <br><br> Judge April M. Perry |

## OPINION AND ORDER

In 2021, Plaintiff Tammy MacDonald and her husband Plaintiff Jeffrey MacDonald applied for and were denied a home equity loan from Centier Bank. Plaintiffs fault Defendant Servis One, Inc., d.b.a. BSI Financial Services ("BSI") for the denial. Specifically, Plaintiffs assert that BSI inaccurately reported delinquent mortgage payments on Mrs. MacDonald's credit report, even though her liability on that mortgage had been discharged in bankruptcy years earlier. Without access to the line of credit from Centier, Plaintiffs claim they were forced to sell property in order to meet their debt obligations.

This opinion resolves a motion for summary judgment filed by BSI as to Plaintiffs' suit under the Fair Credit Reporting Action ("FCRA"). BSI argues that Plaintiffs cannot prove that any inaccuracies it placed on Mrs. MacDonald's credit report caused Plaintiffs' injuries and also that the FCRA does not apply to inaccurate reporting about mortgage payments associated with a rental property. The Court rejects these arguments and denies BSI's motion for summary judgment.

**LEGAL STANDARD**

Summary judgment is appropriate when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmovant then must come forward with specific facts showing there is a genuine issue for trial. *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). That is, to avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). So while the court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor, this obligation does not extend to drawing inferences that are supported by only speculation or conjecture. *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

Local Rule 56.1 sets out procedures parties must follow when filing and responding to motions for summary judgment in the Northern District of Illinois. The Rule's purpose is "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation omitted). Under the Rule, the movant must supply the Court with "a statement of material facts" in the form of numbered paragraphs asserting what it considers to be undisputed facts. L.R. 56.1(a); Fed. R. Civ. P. 56(c)(1). Each asserted fact "must be supported by citation to the specific evidentiary material, including the specific page number, that supports it," and may be disregarded if presented without supporting citation. L.R. 56.1(d)(2). In response to a statement of facts, the opposing party must file "a response to each numbered paragraph in

the moving party's statement" and may also submit additional facts with citations. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); L.R. 56.1(b), (e). If it disagrees with a fact asserted by the movant, the opposing party's response must cite "specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). Once statements are submitted and responded to, the district court may limit its analysis of the facts on summary judgment "to evidence that is properly identified and supported in the parties' statements." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

## FACTS AT SUMMARY JUDGMENT

The following relevant facts are undisputed. In 2002, Plaintiffs executed a mortgage secured by a property on Kenmore Avenue in Chicago, Illinois (the "Kenmore property"). Doc. 117-1 ¶ 3. A few years later, the couple filed for Chapter 7 bankruptcy and had their personal liability for that mortgage discharged, though it remained a lien on the property towards which they continued to make regular payments. *Id.* ¶¶ 5-7. From August 2016 until May 2018, BSI serviced the Kenmore property's mortgage. *Id.* ¶ 9.

In 2017, Plaintiffs applied for a home equity loan from Centier Bank ("Centier"), to be secured by Plaintiffs' personal residence. Doc. 117-1 ¶¶ 16, 18. Centier denied the application. *Id.* ¶ 26. Then, in 2021, the couple applied jointly for another home equity loan with Centier, this time offering an investment property on Towle Avenue in Hammond, Indiana as collateral (the "Towle property"). *Id.* ¶¶ 28-29. Again, Centier denied the application. *Id.* ¶ 49. Among the materials Centier reviewed to reach its 2021 decision was Mrs. MacDonald's TransUnion credit report from March 2021. *See* Doc. 116-6 ("Ex. 4") at 13. This report included a tradeline by BSI for delinquent payments towards the Kenmore mortgage. *Id.* No BSI tradeline appears on the

copy of Mr. MacDonald's credit report Centier considered in connection with the 2021 home equity loan application. *Id*. at 8-9. Due to the denial, Plaintiffs were forced to sell the Towle property in order to meet various debt obligations, and Mrs. MacDonald has testified that she suffered emotionally. Doc. 118-1 ¶¶ 87, 93-96.

The parties dispute the reason for Centier's denial of the 2021 loan application. Plaintiffs assert that the BSI tradeline on Mrs. MacDonald's credit report contributed to Centier's decision; BSI contends it did not. The parties also dispute whether the mortgage taken on the Kenmore property qualifies as a business or personal loan, but as the Court will explain, this distinction is not relevant to resolving this motion.

## ANALYSIS

The FCRA seeks to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). Section 1681s-2(b) of the FCRA requires "furnishers," defined as the entities that provide consumer information to credit agencies, to take investigative and corrective steps after receiving notice that information they supplied to a credit agency may be incomplete or inaccurate. *See* 15 U.S.C. § 1681s-2a. A furnisher who willfully or negligently fails to comply with this requirement can be sued by consumers harmed by the furnisher's misreporting. *See* 15 U.S.C. §§ 1681n, 1681o. "To bring a successful claim, the consumer must … show that she suffered injury as a result of any inaccurate information." *Aldaco v. RentGrow, Inc.*, 921 F.3d 685, 689 (7th Cir. 2019). And where plaintiffs seek actual damages under the FCRA based on a credit denial, they must demonstrate a "causal relation between the violation of the statute and the loss of credit." *Crabill v. Trans Union L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001).

BSI seeks summary judgment on two grounds. First, it contends Plaintiffs cannot establish a causal link between BSI's inaccurate reporting and Centier's denial of the 2021 home equity loan application.[1] Accordingly, BSI argues Plaintiffs may not seek actual damages based on the sale of their investment property or emotional distress, since these harms all flowed from the Centier credit denial. Second, BSI argues Plaintiffs cannot maintain their FCRA claim because the mortgage loan serviced by BSI is for a rental property, which qualifies it as a business loan and puts BSI beyond the FCRA's reach.

### I. Proximate Cause of Damages

BSI contends that its inaccurate reporting could not have caused Centier to deny Plaintiffs' loan application because Centier reached its decision for independent reasons. Primarily, BSI argues Mr. MacDonald's credit was bad enough on its own to merit denial of the joint loan application. *See* Doc. 116-1 at 4.

The Court rejects this argument because it is not supported by undisputed facts. BSI directs the Court to paragraphs 34 through 58 of its statement of material facts to support its factual argument about Centier's underwriting analysis. *See* Doc. 116-1 at 4; Doc. 118 at 2. But none of these paragraphs speak to the weight Centier accorded Mr. MacDonald's troubled credit history. *See* Doc. 117-1 ¶¶ 34-58. Rather, paragraphs 34 through 43 offer a litany of details and excerpts from Plaintiffs' credit reports, and paragraphs 44 through 47 flag the short time between when Centier started considering the Plaintiffs' application and Centier's decision to deny it. *See id.* While interesting, these facts do not address how Centier factored Mr. MacDonald's credit

---

[1] BSI does not seek summary judgment on the issue of liability, i.e., whether it failed to comply with Section 1681s-2(b).

into its consideration of the application, or what a short turnaround time reveals about the substance of Centier's decision-making process.[2]

BSI comes closer in paragraphs 48 through 52, which describe the Centier documents that list written reasons why Centier denied Plaintiffs' joint application and summarize deposition testimony from Centier's representative. *See* Doc. 117-1 ¶¶ 48-52. Because BSI's characterization of those exhibits is disputed by Plaintiffs, the Court will focus on the documentary exhibits themselves. *See* Ex. 4 , Doc. 116-6 at 1-4, (Centier letters detailing denial decision) 8 (Centier's internal underwriting decision report), and Ex. 5, Doc. 116-7 (Centier representative's deposition). Mr. MacDonald's letter from Centier lists only two reasons for the application's denial: a "Collection action or judgment" and "Delinquent past or present credit obligations with others." Doc. 116-6 at 2. From this, BSI infers (1) that these two reasons are exhaustive of the reasons for the denial and that each provides an independent basis for the denial; and (2) that both reasons relate to Mr. MacDonald. However, BSI has adduced no evidence to establish that the reasons for denial listed in Centier's letters to customers include all of the reasons for the denial or that each reason stands alone as an independent basis for the denial. Had BSI wanted to ask Centier's representative that very question, it could have done so; it did not. To the contrary, the question asked of the Centier representative was whether the denial letter gives "in *summary* fashion *some* of the reasons why his credit was denied." Doc. 116-7 at 9 (emphasis added). Nor has BSI presented evidence to establish that the "delinquent past or present credit obligations" relates only to Mr. MacDonald's credit report. The Centier representative testified that for joint applications, "the adverse action reasons are listed the same

---

[2] Some of these paragraphs excerpt the deposition testimony of John Misiora, a Centier Bank representative, but in each of these excerpts, Mr. Misiora is simply asked to confirm what Mr. MacDonald's report says, not how it factored into Centier's analysis.

6

for both applicants whether they show up on one applicant or not." Doc. 116-7 at 10. There was a delinquent past credit obligation listed on Mrs. MacDonald's credit report: namely, the BSI tradeline. Furthermore, as Plaintiffs point out, Centier's employees noted Mrs. MacDonald's "prior mortgage delinquencies" when discussing the application, which undermines BSI's inference that Mr. MacDonald's credit was the sole reason for denial. Doc. 116-6 at 8. For the purposes of this motion, the Court must draw reasonable inferences in favor of Plaintiffs. As such, the Court rejects the argument that the denial letter from Centier suffices to establish that Mr. MacDonald's credit on its own formed the basis for Centier's denial.

In the same vein, the Court rejects BSI's argument that Centier's denial of a separate credit application by Plaintiffs in 2017 proves BSI's reporting of the Kenmore mortgage was not a factor in the 2021 denial. BSI contends that in both years, Centier denied Plaintiffs' joint application due to problems related to Mr. MacDonald's credit, and that in any event, BSI was not servicing Plaintiff's mortgage loan in 2017. *See* Doc. 116-1 at 4-5. As a preliminary matter, the Court notes that the 2017 and 2021 home equity loan applications were for different amounts and to be secured by different properties, and the Court therefore cannot draw the inference that the underwriting process was the same. But even accepting arguendo the comparability of the 2017 and 2021 applications, the comparison is not persuasive because inaccurate reporting by BSI was also considered by Centier in 2017. Contrary to BSI's assertion, it is undisputed that BSI began servicing Plaintiffs' mortgage in August 2016, *see* Doc. 117-1 ¶ 9, which is before the 2017 application. Moreover, a BSI mortgage tradeline appears in Mrs. MacDonald's June 2017 TransUnion report that Centier considered for the 2017 joint application. *See* Doc. 116-6 at 34. As such, Mrs. MacDonald's delinquent credit obligations that BSI purportedly misreported could have contributed to both the 2017 and 2021 denials.

BSI's remaining assertions do not move the needle. It contends that Mr. MacDonald's credit score was too low to be approved, *see* Doc. 117-1 ¶ 56, but Centier's representative never testified that Centier does not approve mortgage loans for applicants with credit scores in that credit range. *See* Doc. 116-7 at 13. BSI also asserts that Mrs. MacDonald could not have qualified for a loan on her own due to her lack of income. Doc. 117-1 ¶¶ 57-58. Maybe so, but Mrs. MacDonald was not trying to get a loan on her own; she filed a joint application. The idea of a joint loan (just like a marriage) is that the two applicants are stronger together than they would be individually. But if all Mrs. MacDonald brought to the application was inaccurately reported mortgage delinquencies, then it is a reasonable inference that those delinquencies hurt the approval odds.

The Court concludes BSI has not carried its initial burden as movant to establish the absence of a genuine issue as to whether BSI's inaccurate reporting factored into Centier's decision to deny Plaintiffs' credit application. This is especially true in light of evidence Plaintiffs have submitted showing that Centier employees specifically referenced Mrs. MacDonald's "prior mortgage delinquencies" as a reason for denying the loan. *See* Doc. 118-1 ¶ 82. Plaintiffs bolster their argument further with deposition testimony by Centier's representative stating that Centier considers late mortgage payments as particularly detrimental to a creditworthiness determination. *See* Doc. 118-1 ¶ 84. These facts suffice to demonstrate that the causal relationship between BSI's inaccurate reporting and Plaintiffs' damages remains a genuine issue for trial.

## II. Whether the FCRA Reaches Reporting on Loans for Business Purposes

BSI also contends that Plaintiffs' FCRA claim fails because Plaintiffs rent out the Kenmore property, making any mortgage taken out on the property a loan for business rather

than personal purposes. According to BSI, this matters because the FCRA does not prohibit furnishers from supplying inaccurate information about business-related debts, meaning Plaintiffs cannot succeed. Doc. 116-1 at 8-12.

This is not a correct statement of law. The FCRA seeks to protect consumers from inaccurate credit reporting on "consumer reports," which it defines as "any … communication of any information by a consumer reporting agency … which is used or expected to be used … for the purpose of serving as a factor in establishing the consumer's eligibility for … credit or insurance to be used primarily for personal, family, or household purposes." 15 U.S.C. § 1681a(d). A plaintiff can show that their FCRA claim concerns a "consumer report" by demonstrating *inter alia* that "the person who requests the report actually uses the report for one of the "consumer purposes" set forth in the FCRA, i.e., personal, family, or household purposes. *Ippolito v. WNS, Inc.*, 864 F.2d 440, 449 (7th Cir. 1988). Put differently, a report constitutes a "consumer report" under the FCRA based on whether the report is generated for a consumer's personal versus business reasons, not whether negative or inaccurate tradelines appearing on that report pertain to business versus personal loans.

In other words, BSI has it backwards. The Court takes no issue with BSI's collected cases, which indicate that courts around the country have concluded the FCRA does not apply to inaccuracies on credit reports for individuals seeking credit for business expenses. Doc. 116-1 at 11-12 (collecting cases). But that is not what Plaintiffs were doing. BSI is correct that this case requires a "personal, family, or household purposes" inquiry; but that inquiry relates to whether Plaintiffs' request for a home equity line of credit had such a purpose, not how Plaintiffs used the Kenmore property.

9

On the merits, BSI's own statement of material facts indicates that the purpose of the 2021 application was "to make home improvements and to consolidate credit card debt." Doc. 117-1 ¶ 33. Plaintiffs dispute the former, asserting that the loan was solely "to pay off credit card debt." *Id*. The language of the application favors BSI's argument that "home improvement" was at least part of the purpose for the 2021 loan. Doc. 116-6 at 6. But it is not clear from the record whether "home" refers to a rental property or the Plaintiffs' residence. Home equity lines of credit are secured by real property, but consumers generally are not required to use that credit for improvements on the collateral property (in this case, the Towle property), and there is no indication that the MacDonalds intended or Centier understood the application to be for improvements to a rental property. To the contrary, comments from Centier employees list "debt consolidation" as an additional purpose for the loan. *Id*. at 8. BSI doesn't argue that debt consolidation would constitute a business purpose, and so the Court concludes that there is a genuine issue of fact as to the whether the purpose of the 2021 loan was for personal use or, perhaps, mixed personal and business uses (if the property to be improved was a rental property managed by Plaintiffs). Having failed to demonstrate the absence of a genuine issue of material fact, the Court rejects BSI's argument as a basis for summary judgment.

## CONCLUSION

For the foregoing reasons, BSI's motion for summary judgment is denied.

Dated: February 20, 2025

_____
APRIL M. PERRY
United States District Judge